FILED

2011 DEC 20   AM 10: 54

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1   MARK LANPHER
    E-mail: lanpherm@sec.gov
2   Securities Exchange Commission
    100 F Street, N.E.
3   Washington, DC 20549
    Telephone: (202) 551-4879
4   Facsimile: (202) 772-9282

5   Local Counsel
    David J. Van Havermaat, Cal. Bar No. 175761
6   vanhavermaatd@sec.gov
    Securities and Exchange Commission
7   5670 Wilshire Boulevard, 11th Floor
    Los Angeles, CA 90036
8   Telephone: (323) 965-3840
    Facsimile: (323) 965-3908
9   Attorneys for Plaintiff

10

11                    UNITED STATES DISTRICT COURT

12                    CENTRAL DISTRICT OF CALIFORNIA

13

14   SECURITIES AND EXCHANGE          Case No. SACV11-1962-JVS (ANx)
     COMMISSION,
15
              Plaintiff,
16
         vs.
17
     HEART TRONICS, INC., MITCHELL JAY          COMPLAINT
18   STEIN, WILLIE JAMES GAULT,
     J. ROWLAND PERKINS, II, MARTIN
19   BERT CARTER,  MARK CROSBY
     NEVDAHL, and RYAN ALLAN RAUCH,
20            Defendants,

21   TRACEY HAMPTON-STEIN, ARC
     FINANCE GROUP, LLC, ARC BLIND
22   TRUST, THS BLIND TRUST, JAYMI
     BLIND TRUST, OAK TREE
23   INVESTMENTS BLIND TRUST, WBT
     INVESTMENTS BLIND TRUST, CATCH
24   83 GENERAL PARTNERSHIP, and FIVE
     INVESTMENTS PARTNERSHIP,
25            Relief Defendants.

26

27

28        Plaintiff Securities and Exchange Commission (the "Commission") alleges:

# SUMMARY

1.     Between December 2005 and December 2008, defendant Mitchell J. Stein ("Stein"), the purported outside counsel of defendant Heart Tronics, Inc. (f/k/a Signalife, Inc. and Recom Managed Systems, Inc.) ("Heart Tronics" or the "Company") and husband of its majority shareholder, orchestrated a brazen series of frauds designed to inflate the price of Heart Tronics stock so that he could profit from selling its securities to investors.

2.     Stein held himself out as Heart Tronics' outside counsel and claimed not to be a Company officer or director; however, in practice, Stein was a *de facto* officer who controlled many of Heart Tronics' business decisions and public disclosures. In that capacity, Stein orchestrated the repeated announcement of fictitious sales orders for Heart Tronics' products in public filings with the Commission, press releases, and other public broadcasts, all designed to make it appear that Heart Tronics was more successful than it actually was. Stein also installed former professional football player Willie Gault ("Gault") as a figurehead co-CEO along with former Hollywood executive J. Rowland Perkins ("Perkins") in order to generate publicity for the company and foster investor confidence. Through this and other fraudulent schemes described below, Stein was able to obtain for himself millions of dollars in ill-gotten gains at the expense of public investors.

3.     In 2002, Stein's wife, relief defendant Tracey Hampton-Stein ("Hampton-Stein"), became the largest shareholder of Heart Tronics, owning approximately 85% of the Company's common stock. She owned this stock through a holding company, relief defendant ARC Finance Group, LLC ("ARC Finance"). From at least December 2005 through September 2008, while Stein was orchestrating a campaign of misinformation designed to inflate the price of Heart Tronics stock, Stein and Hampton-Stein (collectively, "the Steins") directed the sale of more than $5.8 million worth of Heart Tronics stock without disclosing

it to the public as required by law.  To conceal their purchases, the Steins used accounts in the name of purportedly blind trusts and other nominee entities, identified above as relief defendants.  The Steins used the proceeds of the sales to fund their lavish lifestyle, which included multiple homes, exotic cars, and private jets.

4.     To accomplish this, Stein enlisted defendant Mark Nevdahl ("Nevdahl"), a registered representative of a broker-dealer registered with the Commission (stock broker) to act as the trustee on the blind trust accounts.  This created the façade that the Steins' Heart Tronics stock was held by separate legal entities under the control of an independent trustee, when, in fact, the trusts were "blind" in name only.  Nevdahl met the Steins' regular demands for cash by continually selling Heart Tronics stock through the trusts.  The blind trusts were further designed as part of a scheme to avoid the required regular public disclosures under the federal securities laws of ARC Finance's sales.

5.     Stein was also aided in his fraudulent schemes by, among others, defendant Martin Carter ("Carter").  For example, Stein and Carter fabricated documents designed to make it appear to Company officers that Heart Tronics had entered into viable sales orders for millions of dollars worth of Heart Tronics products when, in fact, it did not.

6.     At the same time, Stein drafted false and misleading press releases and other public statements for the Company to announce sales orders, or directed other Company officers to draft public statements based on false and misleading information he provided.

7.     For his role in the scheme, Carter received, among other things, approximately $600,000 in cash and approximately $1.4 million in improperly registered Heart Tronics stock pursuant to a sham consulting agreement between Carter and Heart Tronics.  At Stein's direction, Carter sold the Heart Tronics stock in the market and kicked-back substantially all the cash and proceeds of the stock

1 | sales to Stein.

2 |     8.    During the relevant period, although nominally the senior-most

3 | officers of Heart Tronics, Gault and Perkins rarely questioned Stein's direction and

4 | abdicated their fiduciary responsibilities to Heart Tronics shareholders.  Among

5 | other things, Gault and Perkins signed, or unlawfully authorized to be signed,

6 | public Commission filings containing false statements about the Company's

7 | purported sales.

8 |     9.    In late 2008, Stein and Gault also defrauded an individual investor

9 | into making a substantial investment in Heart Tronics based on, among other

10 | things, materially false representations that the proceeds of the investment would

11 | be used for the Company's operational expenses.  Instead, Stein and Gault diverted

12 | the investor's proceeds for their personal use, including the purchase of Heart

13 | Tronics stock on the open market to create the appearance of active trading volume

14 | and to inflate Heart Tronics' stock price.

15 |     10.    In an additional effort to artificially inflate Heart Tronics' stock price,

16 | Stein caused Heart Tronics to hire promoters to tout Heart Tronics' stock to

17 | investors.  One such promoter, defendant Ryan Rauch ("Rauch"), solicited

18 | numerous investment advisers, institutional and retail brokers, and other investors

19 | to buy Heart Tronics stock.  Rauch purported to give objective recommendations,

20 | but failed to disclose that he was being compensated by the Company in exchange

21 | for his promotion.

22 |     11.    By the third quarter of 2008, Heart Tronics had incurred cumulative

23 | net losses of more than $60 million, and it has been delinquent in its public filings

24 | with the Commission since it failed to file its Form 10-K for fiscal year 2008.

25 | Stein and the other defendants, however, reaped ill-gotten gains from their

26 | violations of the federal securities laws of approximately $8 million.

27 |     12.    By engaging in the practices and transactions alleged in this

28 | Complaint, defendants violated numerous provisions of the federal securities laws.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts or transactions constituting federal securities law violations occurred within the Central District of California and several of the defendants reside in this district.

15.     Defendants, directly or indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in furtherance of the acts, practices and courses of business described in this Complaint.

## DEFENDANTS

16.     Heart Tronics is a Delaware corporation headquartered during the relevant period in Studio City, California and, earlier, in Greenville, South Carolina. During various time periods relevant to this Complaint, Heart Tronics was known by its prior corporate names, including primarily "Signalife, Inc." from November 2, 2005 through November 20, 2008; accordingly, all references herein to "Heart Tronics" refer to Company under its prior names as well as under the name Heart Tronics, Inc. Heart Tronics became a public company in 2002 via a reverse merger with a public shell company. Heart Tronics purports to sell a proprietary electrocardiogram (heart monitoring device) called the Fidelity 100. At all relevant times, the Company's common stock was registered with the Commission pursuant to Section 12(g) of the Exchange Act. At all relevant times, Heart Tronics filed reports with the Commission pursuant to Section 13 of the Exchange Act. The common stock of Heart Tronics was listed on the American Stock Exchange ("AMEX") from approximately June 8, 2005 until September 15,

1  2008. Heart Tronics' stock is now quoted on the OTC Link (formerly "Pink

2  Sheets") under the symbol "HRTT.PK."

3       17.    Mitchell Jay Stein ("Stein") is a California attorney who has

4  purportedly acted as outside counsel to Heart Tronics from approximately 2002 to

5  the present. From at least December 2005 through December 2008, Stein

6  effectively controlled Heart Tronics and its officers, but nominally was not an

7  officer, director or shareholder of the Company. Stein is married to relief

8  defendant Tracey Hampton-Stein. Stein is a United States citizen living in Hidden

9  Hills, California.

10      18.    Willie James Gault ("Gault") is a former professional football player.

11 From approximately October 15, 2008, through June 23, 2011, Gault was Heart

12 Tronics' President and "co-CEO of Administration." Gault also served on Heart

13 Tronics' Board of Directors from approximately July 28, 2008, through June 23,

14 2011. Gault is a United States citizen living in Encino, California.

15      19.    J. Rowland Perkins II ("Perkins") is the current Chief Executive

16 Officer of Heart Tronics. Perkins served as Heart Tronics' interim CEO beginning

17 on or about May 1, 2008. He became CEO on or about June 1, 2008, but later

18 shared responsibility with Gault as "co-CEO for Operations." Perkins has served

19 on Heart Tronics' Board of Directors since approximately August 23, 2005, in

20 roles including Chairman and member of the Audit Committee. Previously,

21 Perkins was a founder of the Creative Artists Agency talent agency. Perkins is a

22 United States citizen living in Beverly Hills, California.

23      20.    Martin Bert Carter ("Carter") was purportedly a consultant to Heart

24 Tronics from approximately January 20, 2008, through November 5, 2008. Carter

25 is an unlicensed electrician who provided handyman, chauffer and other personal

26 services for Stein. Carter is a United States citizen living in Boca Raton, Florida.

27      21.    Mark Crosby Nevdahl ("Nevdahl") is a registered representative

28 presently associated with a broker-dealer firm registered with the Commission. At

1   all relevant times, Nevdahl served as the stock broker and trustee for the

2   purportedly blind trusts beneficially owned by the Steins.  Nevdahl is a United

3   States citizen living in Spokane, Washington.

4       22.    Ryan Allan Rauch ("Rauch") is a former securities research analyst

5   who was an "investor relations" consultant to Heart Tronics from approximately

6   January 30, 2008 through late April 2008.  Rauch is believed to be unemployed.

7   Rauch is a United States citizen living in San Clemente, California.

8                            **RELIEF DEFENDANTS**

9       23.    Tracey Hampton-Stein ("Hampton-Stein"), the wife of Stein, is the

10  sole managing member of ARC Finance Group LLC, Heart Tronics' largest

11  shareholder.  Hampton-Stein is believed to be unemployed.  Hampton-Stein is a

12  United States citizen living in Hidden Hills, California.   Hampton-Stein was

13  unjustly enriched by receiving the proceeds of the unlawful sale of Heart Tronics

14  stock.

15      24.    ARC Finance Group LLC ("ARC Finance") is a single-member

16  Delaware limited liability company formed in 2002 by Hampton-Stein.  ARC

17  Finance is a shell company that has no business operations, and its address is a

18  private mailbox in Boca Raton, Florida shared by Stein and Hampton-Stein.  ARC

19  Finance has held a majority position of Heart Tronics' securities (originally

20  approximately 85%) since 2002.  ARC Finance was unjustly enriched by receiving

21  the proceeds of the unlawful sale of Heart Tronics stock.

22      25.    ARC Blind Trust is a purportedly blind trust established on or about

23  December 19, 2005 under the laws of the State of Nevada.  ARC Finance was both

24  the settlor and the beneficiary of the trust.  Nevdahl served as both the trustee and

25  the broker of the trust's brokerage account.  ARC Blind Trust was unjustly

26  enriched by receiving the proceeds of the unlawful sale of Heart Tronics stock.

27      26.    THS Blind Trust is a purportedly blind trust established on or about

28  August 1, 2005 under the laws of the State of Nevada.  ARC Finance was the

1   settlor of the trust and Mitchell Stein was the beneficiary. Nevdahl served as both

2   the trustee and the broker of the trust's brokerage account. THS Blind Trust was

3   unjustly enriched by receiving the proceeds of the unlawful sale of Heart Tronics

4   stock.

5        27.    JAYMI Blind Trust is a purportedly blind trust established on or

6   about March 2, 2007 under the laws of the State of Nevada. ARC Finance was

7   both the settlor and the beneficiary of the trust. Nevdahl served as both the trustee

8   of the trust and broker of the trust's brokerage account. JAYMI Blind Trust was

9   unjustly enriched by receiving shares of Heart Tronics stock from ARC Finance

10  and the proceeds of the unlawful sale of Heart Tronics stock.

11       28.    Oak Tree Investments Blind Trust is a purportedly blind trust

12  established on or about March 30, 2008, under the laws of the State of Nevada.

13  ARC Finance was both the settlor and the beneficiary of the trust. Nevdahl served

14  as the co-trustee and the broker of the trust's brokerage account. The Steins'

15  former housekeeper served as the other co-trustee. Oak Tree Investments Blind

16  Trust was unjustly enriched by receiving shares of Heart Tronics stock from ARC

17  Finance.

18       29.    WBT Investments Blind Trust is a purportedly blind trust established

19  on or about September 21, 2007 under the laws of the State of Nevada. ARC

20  Finance was both the settlor and the beneficiary of the trust. Nevdahl served as

21  both the trustee of the trust and broker of the trust's brokerage account. WBT

22  Investments Blind Trust was unjustly enriched by receiving shares of Heart

23  Tronics stock from ARC Finance.

24       30.    Catch 83 General Partnership is a general partnership formed on or

25  about April 5, 2005 between Gault and his daughter. Gault conducted his personal

26  securities trading through brokerage accounts in the name of Catch 83 General

27  Partnership, and Nevdahl served as the broker. Catch 83 General Partnership was

28  unjustly enriched by receiving investor capital diverted from Heart Tronics and the

1  proceeds of the unlawful sale of Heart Tronics stock.

2      31.  Five Investments Partnership is a general partnership formed on or

3  about December 11, 2006 under the laws of the State of Nevada between Stein and

4  Carter. Nevdahl was the broker on Five Investments' brokerage account. Five

5  Investments Partnership was unjustly enriched by receiving shares of stock issued

6  by Heart Tronics from transactions unlawfully registered with the Commission on

7  Form S-8, or the proceeds from the unlawful sale of such stock.

8                          **OTHER RELEVANT PERSON**

9      32.  Dr. Lowell T. Harmison, Ph. D., deceased, served as President and

10  Chief Operating Officer of Heart Tronics beginning on July 2, 2007. He served as

11  President and CEO from August 17, 2007, through June 2, 2008. Harmison also

12  served as a member of Heart Tronics' Board of Directors from June 6, 2003, to

13  June 8, 2008.

14                          **FACTUAL ALLEGATIONS**

15  **I.    Schemes to Inflate the Price of Heart Tronics Stock**

16      33.  From at least December 2005 through December 2008, Stein,

17  together at times with certain of his co-defendants, engaged in fraudulent

18  schemes to inflate the price of Heart Tronics stock. They did so primarily

19  through a campaign of misinformation centered around falsely reporting

20  fictitious sales orders of Heart Tronics' flagship product, the Fidelity 100, in

21  an effort to make Heart Tronics appear more successful than it was.

22          **A. Fraudulent Disclosure of Sales Revenue in 2006**

23      34.  In approximately September 2006, after previously having arranged a

24  failed joint sales marketing arrangement with another company, Stein arranged a

25  transaction to create the false impression that Heart Tronics had made, and profited

26  from, its first sale of its Fidelity 100 product.

27      35.  More specifically, Stein arranged for a company that specialized in

28  leasing cars and equipment (the "Leasing Company") to finance a lease of Fidelity

100 units from Heart Tronics to a doctor in Los Angeles (the "Doctor"). The Leasing Company, which had previously leased luxury cars to Stein, agreed to finance the transaction based on Stein's representations that the Doctor was a *bona fide* customer, that Stein would personally guarantee the loan, and that the product would be used by the Doctor for medical purposes. The Doctor was a personal friend of Stein's, whom Stein brought into the transaction after another physician declined to participate further. In fact, as discussed further below, the Doctor had no legitimate interest in the units and was simply a straw purchaser arranged by Stein.

36. In approximately September 2006, the Leasing Company agreed to purchase 11 units of Heart Tronics' Fidelity 100 product and lease them to the Doctor. On or about September 30, 2006, the Leasing Company issued a check for the full purchase price payable to Heart Tronics. Under the arrangement, Heart Tronics would deliver the Fidelity 100 to the Doctor pursuant to a separate purchase or lease agreement.

37. On or about September 20, 2006, in connection with this purported sale to the Doctor, Heart Tronics issued a materially false and misleading press release announcing that the Fidelity 100 "has been sold and shipped to everyone from surgeons to cardiologists to internists, to, as well, a multi-billion-dollar corporation." The press release was drafted by Stein or by others based solely on information provided by Stein.

38. In fact, as noted above, the Doctor was not a *bona fide* purchaser. Indeed, the Doctor's initial deposit payment to the Leasing Company failed to clear for insufficient funds, and the Leasing Company did not receive any further payments from the Doctor. The Leasing Company then sought and obtained partial repayment from Stein based on his guarantee of the transaction. While described by the Company as a legitimate sale, Stein effectively self-funded the Doctor's purported lease from September 2006 to September 2008 by paying over

$100,000 to the Leasing Company.  Stein concealed this fact from Heart Tronics'

Chief Financial Officer ("CFO"), its auditor, its outside securities disclosure

counsel (the "Disclosure Lawyer"), and its other officers.  In 2008, Stein ceased

making payments to the Leasing Company, and the Leasing Company re-possessed

at least 8 of the 11 units in their original, unopened shipping boxes.

39.   Notwithstanding these facts, beginning with its Form 10-Q for the

third quarter 2006, which the Company filed with the Commission on November

13, 2006, Heart Tronics stated that it had "recently commenced commercial

marketing of our... Fidelity 100 Monitor System, and recorded our first revenues

from product sales in October 2006."  In substantially the same words, Heart

Tronics repeated these disclosures in each subsequent quarterly and annual report

filed with the Commission through April 3, 2008.  In addition, Heart Tronics'

financial statements included in the Forms 10-K filed with the Commission on

April 2, 2007 and April 3, 2008 reported revenue from product sales of $190,170

in 2006, driven primarily by this purported sale.  This was the only sales revenue

recorded by Heart Tronics in its corporate history; the Company never completed

any further sales to any customer.  The repeated reporting of this sales revenue

from the purported sale to the Doctor, without disclosing the true facts surrounding

the purported sale or its financing (including the fact that it was a related-party

transaction), was materially false and misleading.

**B. Fraudulent Disclosure of Two Additional Fictitious Sales in September 2007**

**1. Fraudulent Sale to "Cardiac Hospital Management"**

40.   On approximately September 14, 2007, Heart Tronics contracted to

sell approximately $2 million worth of its Fidelity 100 product to an individual

located in Portland, Oregon (the "Customer"), who had a prior relationship with

Lowell Harmison, then the CEO of Heart Tronics.  More specifically, the

Customer signed an order to purchase 180 units of the Fidelity 100 for $1,980,000.

1  Stein negotiated and drafted the purchase order with the Customer, and it was

2  signed on behalf of Heart Tronics by Harmison.  The Customer sent Heart Tronics

3  a personal check for $50,000 as a deposit for the units.

4      41.   Heart Tronics disclosed the sales order in a press release dated

5  September 20, 2007 and in the following periodic reports filed with the

6  Commission: (a) Form 10-Q filed November 14, 2007; (b) Form 10-K filed April

7  3, 2008; (c) Form 10-Q filed May 15, 2008; and (d) Form 10-Q filed August 15,

8  2008.  These disclosures were drafted by Stein, or by others based solely on

9  information provided by Stein.  As discussed further below, each of these

10  disclosures was materially false and misleading.

11      42.   Although the Customer contracted to purchase the units in his

12  personal capacity for use in the medical supply business he owned, the purchase

13  order that was counter-signed by Harmison and returned to the Customer identified

14  the Customer as "Cardiac Hospital Management" ("CHM").  CHM is a fictitious

15  entity that was not known to the Customer.

16      43.   At the time of the signing of the purchase order, Stein and Harmison

17  falsely told the Customer that the Fidelity 100 units were fully manufactured and

18  ready to be shipped.  Over the subsequent months, however, Heart Tronics failed

19  to ship any product to the Customer, blaming the delay on manufacturing problems

20  beyond its control.  Accordingly, the Customer terminated the purchase order and

21  had no further contact with Heart Tronics or its officers.  Heart Tronics did not

22  return the Customer's deposit.

23      44.   When it became clear that Heart Tronics could not deliver the product

24  and the Customer was canceling his order, Stein orchestrated an elaborate scheme

25  to mislead Heart Tronics' officers, its auditors, and the public about the sale's

26  continued viability.  The ruse began with a letter dated December 31, 2007,

27  purportedly sent from "CHM," the nominal purchaser inserted on the Customer's

28  September 14, 2007 sales order, indicating that CHM intended for the sale to move

1  forward. The letter provided a "new address" in Tokyo, Japan, and was signed in

2  the name of "Toni Nonoy," the purported purchasing agent of CHM.

3     45.   In fact, this letter was one of many bogus documents created by Stein

4  and Carter to create the illusion that Heart Tronics had a viable sales order. Stein

5  provided the fraudulent letter to Heart Tronics' officers, and the false document

6  was retained in the Company's books and records as support for the continued

7  disclosure of the pending sale.

8     46.   By March 2008, Heart Tronics still had not shipped any product to

9  CHM which, as discussed above, did not exist. However, Stein sought to ensure

10 that the pending purchase order was still included in the Company's public filings

11 with the Commission because reporting sales orders would inflate the price of

12 Heart Tronics' stock and potentially attract new investors or customers.

13    47.   Given the materiality of the $1.98 million dollar sales order to the

14 Company's financial disclosures, in connection with preparing the Company's

15 disclosures in the Form 10-K to be filed in April 2008, Heart Tronics' CFO and

16 Disclosure Lawyer sought to obtain confirmation from CHM of its intention to

17 complete the purchase. Stein provided them with a toll-free fax number,

18 purportedly for CHM, to which they could send such a request for confirmation.

19 On March 21, 2008, the Disclosure Lawyer and CFO faxed a confirmation letter to

20 CHM at the number that had been provided by Stein. Unbeknownst to the

21 Disclosure Lawyer or CFO, the toll-free number had, in fact, been registered by

22 Carter at Stein's request as part of the scheme to continue the façade that there was

23 a legitimate purchaser on the other end of the CHM sales order.

24    48.   On March 25, 2008, a confirmation letter, purportedly signed by

25 CHM's "Tony Nony" (a different spelling of the name of the purported CHM

26 purchasing agent) was returned to the Disclosure Lawyer and CFO by facsimile.

27 In fact, Carter, pretending to be "Tony Nony," fraudulently signed and transmitted

28 the false confirmation letter to the Disclosure Lawyer and CFO at Stein's direction.

1  Indeed, the fax number from which the facsimile was sent was registered to
2  Carter's residence in Boca Raton, Florida.

3      49.   Over the ensuing months, Carter and Stein prepared other false
4  documents to give the impression to Heart Tronics' officers, as well as the public,
5  that the CHM sale was still viable.  For example, in June 2008, Stein gave Carter
6  an envelope addressed to Heart Tronics and instructed him to travel to Tokyo,
7  Japan to mail the letter back to Heart Tronics to create the appearance that it
8  originated from Japan.  Carter made a one-day round trip to Japan in
9  approximately July 2008 to carry out Stein's instructions.

10     50.   Harmison, the CFO, the Disclosure Lawyer, and Heart Tronics'
11 auditors relied on the false documents prepared by Stein and Carter in preparing
12 and filing the Company's 2007 Form 10-K and Form 10-Qs for the fiscal quarters
13 ended September 30, 2007, March 31, 2008, and June 30, 2008 (filed on April 3,
14 2008, November 14, 2007, May 15, 2008, and August 15, 2008, respectively).  In
15 each of those filings, Heart Tronics fraudulently reported that it had a significant
16 pending purchase order with a hospital/medical group purchasing organization
17 (CHM) with expected gross proceeds of $1,980,000.  Because the Company did
18 not otherwise have sales revenue, the repeated false and misleading disclosure of
19 these pending sales orders was plainly material.

20                    **2. Fraudulent Sale to "IT Healthcare"**

21     51.   Meanwhile, at the same time he was orchestrating the scheme with
22 respect to CHM, Stein orchestrated a similar scheme with respect to a second
23 fictional sales order.

24     52.   On approximately September 24, 2007, Heart Tronics purportedly
25 entered into an order to sell 300 units of the Fidelity 100 to an Israeli entity called
26 "IT Healthcare" for $3.3 million.  On October 4, 2007, the Company purportedly
27 entered into a follow-on sales order with IT Healthcare for an additional 47 units
28 for $564,000.

53.   The sales were disclosed to the public by the Company in press releases drafted by Stein, or by others based solely on information provided by Stein, dated September 25, 2007, and October 10, 2007.   The Company also disclosed the pending sales in the following periodic reports filed with the Commission: (a) Form 10-Q filed November 14, 2007; (b) Form 10-K filed April 3, 2008; (c) Form 10-Q filed May 15, 2008; and (d) Form 10-Q filed August 15, 2008.

54.   However, IT Healthcare was a fictional company and not a *bona fide* purchaser of Heart Tronics' products.

55.   Prior to this supposed sales order by IT Healthcare, Heart Tronics had only recognized nominal revenue from product sales related to the purported sale involving the Doctor and the Leasing Company in 2006.  Even the supposed sales order by CHM was valued at only approximately half the value of the IT Healthcare order.  Therefore, the press releases and Commission filings disclosing the pending sale to IT Healthcare were material.

56.   Stein and Carter fabricated and executed documents related to this transaction, including the sales orders, confirmations, and shipping instructions, in the name of fictitious people supposedly affiliated with IT Healthcare, just as they did for the CHM sale.  As with the fake CHM documents, several documents supposedly written by an officer of IT Healthcare contained disparate spellings of that person's name.

57.   As with the disclosure of the CHM sale, in early 2008, Heart Tronics' Disclosure Lawyer and CFO sought confirmation that the purported sales orders from IT Healthcare were still viable prior to disclosing them in the Company's public filings with the Commission, because the large sales orders would be material to investors.  Accordingly, they sent a letter to IT Healthcare, via a facsimile number provided by Stein, requesting the customer confirm its intention to complete the sales.  In reply, the Disclosure Lawyer and CFO received a

1   facsimile containing a signed confirmation and other correspondence purportedly

2   from IT Healthcare.

3       58.   In reality, just like the earlier confirmation from CHM, this facsimile

4   was a false confirmation sent by Carter at Stein's instruction from the telephone

5   line registered at Carter's home in Boca Raton, Florida.

6       59.   To enhance the illusion of legitimacy regarding the pending sales

7   orders to IT Healthcare, on approximately March 28, 2008 and April 4, 2008, the

8   Company made two shipments of Fidelity 100 units to the fictitious IT Healthcare.

9   On May 15, 2008, Heart Tronics filed its Form 10-Q for the quarter ended March

10  30, 2008, in which it publicly disclosed that it had begun shipping product to

11  customers.  Heart Tronics also issued a press release dated March 25, 2008

12  announcing that the Company "has been and continues to ship orders," although

13  the press release pre-dated by several days actual tender of boxes to the carrier for

14  shipment.  Regardless, for the reasons stated below, these disclosures were

15  materially false and misleading.

16      60.   While the Company did actually ship approximately 15 Fidelity 100

17  units to the attention of "IT HealthCare—Agency Division" at an address in

18  Loveland, Ohio, this address was not associated with any *bona fide* purchaser.

19  Instead, this address was the residence of Carter's high school friend, who ran a

20  landscaping business from his home.  Stein and Carter had arranged for Carter's

21  friend to store the shipment of boxes as a personal favor.  To further conceal the

22  scheme, the telephone number for IT Healthcare that appeared on the shipping

23  instructions was another toll-free telephone number registered by Carter at Stein's

24  direction.

25      61.   In approximately July or August 2008, acting at Stein's direction,

26  Carter collected the boxes from his friend, tampered with the product to create the

27  appearance that they were defective, and returned the units to the contract

28  manufacturer as if they were coming from IT Healthcare.  Then, on August 15,

1    2008, Heart Tronics filed its Form 10-Q for the quarter ended June 30, 2008, in

2    which it stated that it had "commenced shipments on the September 24, 2007

3    order, however, they were returned by the lessee on the basis that too much time

4    had passed since the purchase order was given."

5        62.    In fact, this disclosure was materially false and misleading, as it

6    implicitly represents that the products were shipped to a *bona fide* purchaser, and

7    this was not the reason that the Fidelity 100 units had been returned. Rather, Stein

8    caused the units to be returned to delay further discovery of his fraudulent scheme.

9    Indeed, once shipped, Heart Tronics' officers, auditors and investing public would

10   expect to see revenue recognized in the Company's financial statements from the

11   sale; but because Stein knew that the customer was non-existent and the sales order

12   was fictitious from the start, he concocted the scheme to have Carter return the

13   product to the manufacturer as untimely and apparently defective.

14       **C. Fraudulent Disclosure of Further Sales Orders and**

15       **Projected Revenue in 2008**

16       63.    In Spring 2008, at the same time that he was providing false

17   information to Heart Tronics officers and the public about the purported sales

18   orders to CHM and IT Healthcare, Stein caused the Company to make false and

19   misleading statements about additional fraudulent sales orders designed to inflate

20   the price of Heart Tronics stock.

21       64.    On approximately March 17, 2008, Heart Tronics issued a press

22   release announcing that it "has received several formal purchase and financial

23   commitments. . . . These commitments have come internationally, including in

24   Japan, other parts of Asia and Europe, as well as domestically." On March 25,

25   2008, the Company issued a press release announcing that it "has received an

26   additional $7.5 million in Fidelity 100 device delivery orders in the month of

27   March, 2008, which the company intends to fill during the next two quarters. The

28   Company said it may fill these orders sooner." Both press releases were drafted by

1  Stein, or by others based solely on information provided by Stein. Both were

2  materially false and misleading.

3      65.    In fact, Heart Tronics had not entered into formal purchase or

4  financial commitments. Rather, Stein – acting for the Company – had obtained

5  only (1) a preliminary agreement with a Korean company regarding that company

6  becoming a distributor of Heart Tronics' products in Asia, and (2) a one-page

7  "purchase commitment" letter from a company identified as A.R. Pacific Group

8  ("ARPG") that claimed to be based in Japan and was purportedly signed by

9  someone with the name as a person affiliated with CHM. In addition, Stein

10  reported to Harmison and others that he had reached an agreement with an

11  unnamed Chinese company to purchase approximately $180 million worth of

12  Heart Tronics' products. In all three cases, no formal orders for Fidelity 100 units

13  were placed, no monies were received, and no products were shipped. These

14  unsubstantiated, preliminary, and ultimately illusory sales orders were the basis for

15  the Company's several false or misleading public announcements.

16      66.    As he did with respect to the purported purchase orders involving

17  CHM and IT Healthcare, the Disclosure Lawyer requested supporting

18  documentation from Stein related to the purported sales to ARPG for the

19  Company's forthcoming annual report on Form 10-K for the year ended December

20  31, 2007. Stein did not provide any additional information, and the Disclosure

21  Lawyer refused to include any statements about the purported sale in the

22  Company's annual report.

23      67.    On April 14, 2008, however, Harmison held a public "webcast" over

24  the Internet in which he provided investors with guidance on Heart Tronics'

25  projected revenue for the rest of the Company's fiscal year. The script for the

26  webcast was drafted by Stein and Harmison. Harmison announced more than $40

27  million of expected revenue for Heart Tronics over the next five fiscal quarters.

28  Harmison claimed this figure was related to the supposed transactions with the

1  Korean, Japanese and Chinese companies described above.  Neither Stein nor

2  Harmison had any basis for these projections, which were materially false and

3  misleading.

4      68.   Following the webcast, Heart Tronics directors, including Perkins,

5  exchanged emails revealing skepticism of the revenue projections Harmison had

6  made.  They professed concern about Harmison and Stein's ongoing involvement

7  with the Company.

8      69.   In late April 2008, Harmison resigned as CEO.  Perkins became the

9  interim and, subsequently, the permanent CEO.  In addition, the Company hired an

10  outsider as the Company's new President.

11      70.   In May 2008, the new President began to investigate the 2007 and

12  2008 sales orders described above (which were still described in the Company's

13  public filings with the Commission as "pending purchase orders," but for which

14  the Company still had not recognized any revenue).  In doing so, he discovered

15  that the product supposedly shipped to IT Healthcare had, in fact, been shipped to a

16  residential address in Ohio.  He further questioned why the owner of the property,

17  whom he discovered ran a lawn maintenance business, would have any reason to

18  purchase approximately $3.8 million worth of medical equipment.  He brought this

19  information to Perkins' and Stein's attention, but he was told to stop investigating

20  and was accused by Stein of trying to damage the Company.  Shortly thereafter,

21  the new President resigned from the Company.

22      71.   By no later than May 2008, when he took over for Harmison as

23  interim CEO of the Company, Perkins knew or was reckless in not knowing that

24  Heart Tronics disclosures regarding pending sales of Fidelity 100 units were false

25  and misleading.

26      72.   Despite being aware of these significant red flags and his admitted

27  "skeptical" view of the sales, Perkins authorized the IT Healthcare and CHM sales

28  orders to be disclosed in the Form 10-Qs for the first and second fiscal quarters of

1   2008, which he signed and which were filed with the Commission on May 15,

2   2008, and August 15, 2008, respectively. Perkins took no steps to determine the

3   validity of the purportedly pending sales orders or the projections announced by

4   Harmison on behalf of the Company in April 2008. Nor did Perkins take any steps

5   to implement or improve upon the Company's internal controls over financial

6   reporting.

7       73.    When questioned by the Commission staff about the decision by

8   Perkins and other board members not to take any steps to verify the purportedly

9   pending sales orders or Harmison's claims in the webcast, Perkins testified: "We

10  didn't do anything to – I mean, we didn't know what to do, what could you do. I

11  mean, we didn't want to put fuel on the fire. I mean, if you – what are you going

12  to do, come out and say it's wrong? We didn't know what to do. We figured

13  doing nothing was the best way to handle it."

14              **D. Hiring of Stock Promoters to Tout Heart Tronics Stock**

15      74.    At the same time that he was leading a campaign of misinformation

16  about the success of Heart Tronics, Stein enlisted the assistance of several stock

17  promoters to tout Heart Tronics' stock on the Internet.

18      75.    On approximately January 30, 2008, at Stein's direction, Heart

19  Tronics entered into a consulting agreement with a former securities research

20  analyst, defendant Ryan Rauch, purportedly for investor relations and corporate

21  strategy consulting.

22      76.    In reality, Rauch was a stock promoter. Rauch solicited investment

23  advisers, retail and institutional brokers, and other potential investors to buy Heart

24  Tronics stock for themselves or for their clients' accounts.

25      77.    Stein falsely told Rauch that Heart Tronics would imminently

26  announce up to $100 million in sales and that the Company's stock price was

27  artificially depressed by naked short sellers. From approximately January through

28  April 2008, Rauch repeated this information to numerous potential investors, or

1   their brokers or investment advisers, to encourage them to buy Heart Tronics stock.

2   In particular, Rauch encouraged investors to enter orders to buy Heart Tronics

3   stock at or near the time of the market close to attempt to increase the closing price

4   of Heart Tronics' stock.

5        78.   Heart Tronics paid Rauch $75,000 over three months, with a promise

6   of a $250,000 bonus if he could keep the Company's stock price above $1 per

7   share for a period of 30 days, which was one criterion for Heart Tronics to retain

8   its listing on the AMEX.  Rauch generally did not disclose to potential investors

9   that he was being compensated by the Company for promoting Heart Tronics

10   stock.

11   **II.**     **Schemes to Profit from Sales of Heart Tronics Stock**

12        79.   While he was seeking to inflate the price of Heart Tronics stock

13   through the assorted deceptive tactics, materially false and misleading statements,

14   fraudulent schemes, and other means described above, Stein devised numerous

15   ways to profit illicitly from the sale of Heart Tronics securities.

16        **A. Fraudulent Scheme to Secretly Sell Heart Tronics Stock**

17        80.   Stein's primary method of profiting from his scheme was to direct the

18   sale of Heart Tronics stock held by relief defendant ARC Finance, a single-

19   member limited liability company solely owned by his wife, Hampton-Stein.

20        81.   ARC Finance had been the majority shareholder of Heart Tronics

21   since September 2002, when it sold to the Company's predecessor the rights to

22   proprietary technology, valued at $78,023, in exchange for 23.4 million shares of

23   common stock (approximately 85% of the Company's outstanding equity).

24        82.   Although Stein did not file any required forms with the SEC

25   disclosing a beneficial ownership position in Heart Tronics, Stein controlled the

26   voting of ARC Finance's shares and controlled the investment decisions of ARC

27   Finance's assets.

28

1       83.    On June 29, 2005, Heart Tronics registered the resale of 3.5 million of

2 the shares held by ARC Finance with the Commission on Form SB-2.  From July

3 2005 to October 2005, ARC Finance directly sold 344,200 registered shares of

4 Heart Tronics stock for a profit of approximately $1.2 million.

5       84.    Beginning in approximately December 2005, however, Stein devised

6 a scheme to sell ARC Finance's shares without publicly reporting the sales, as

7 required under the federal securities laws.  The scheme allowed Stein to create the

8 appearance that ARC Finance was not selling the previously-registered shares but,

9 rather, holding them as a long-term investment.

10      85.    Beginning in approximately December 2005, ARC Finance

11 transferred a portion of its holdings to two purportedly blind trust accounts, relief

12 defendants ARC Blind Trust and the THS Blind Trust, established for the benefit

13 of ARC Finance and Stein, respectively.  Defendant Mark Nevdahl was appointed

14 trustee for each trust, and also served as the securities broker for each trust.  This

15 created the appearance that the stock was held by independent legal entities

16 controlled by Nevdahl and that neither ARC Finance nor Stein had control over the

17 disposition of the trusts' assets.

18      86.    Nevdahl frequently discussed the accounts he managed for the Steins,

19 including the ARC Blind Trust and the THS Blind Trust, with Stein via telephone,

20 e-mail and correspondence sent via the mails.  On at least two occasions, Nevdahl

21 met with the Steins regarding the management of their investment accounts at their

22 home in Hidden Hills, California.

23      87.    Notwithstanding the fact that the trusts were purportedly blind, ARC

24 Finance, through Stein and his wife, retained control over the shares that were

25 transferred to these trusts.  At Stein's direction, Nevdahl did not re-title the

26 securities in the name of the trusts.  In addition, although the trusts were

27 purportedly "blind," Nevdahl took explicit instructions from Stein over the trusts'

28 corpus.  Among other things, Stein (1) told Nevdahl to generate enough cash

1  (necessitating the sale of stock) each month to meet the Steins' lifestyle demands;

2  (2) told Nevdahl how to vote shares on proxy ballots; and (3) negotiated "private

3  placements" to sell shares held by one of the trusts in off-the-market transactions.

4  Stein also directed Nevdahl to wire the proceeds generated by Nevdahl's share

5  sales to bank accounts in the name of Stein and ARC Finance.  Thus, Nevdahl

6  knew that the purportedly blind trusts were not, in fact, blind.

7      88.   Although the trust indentures placed the obligation on Nevdahl (as

8  trustee) to file reports of any transactions in the trusts required by the federal

9  securities laws, Stein informed Nevdahl that the sales within the trusts were

10  exempt from the reporting requirements under Section 16 of the Exchange Act

11  because the trusts were blind and held less than 10% of Heart Tronics' equity.  In

12  light of his knowledge that the trusts were not, in fact, blind, Nevdahl knew, or was

13  reckless in not knowing, that the transactions were not exempt and that the he was

14  participating in a fraudulent effort to use the trusts to evade the reporting

15  requirements under the federal securities laws.

16      89.   Nevdahl performed no independent analysis of this and other issues

17  pertaining to propriety of the trusts' stock sales, nor did he seek approval from his

18  firm's legal or compliance departments.

19      90.   Between approximately December 2005 and September 2008, the

20  Steins, through transactions executed by Nevdahl, covertly sold more than 3.7

21  million shares of Heart Tronics stock through the ARC Blind Trust and the THS

22  Blind Trust, for more than $5.8 million.  Because the shares had a cost basis of

23  approximately $0.005 per share, nearly all the proceeds were profit.

24      91.   Neither Stein, ARC Finance, ARC Blind Trust nor THS Blind Trust

25  filed any reports with the Commission on Forms 3, 4 or 5 during this period.

26      92.   Nevdahl was paid brokerage commissions of approximately $78,000,

27  in addition to trustee fees, for his work as trustee and broker for the purportedly

28  blind trusts.

93.     Stein used the purportedly "blind" nature of the trusts to intentionally mislead investors regarding ARC Finance's share position in Heart Tronics' periodic reports filed with the Commission.  For example, the Company disclosed in its annual report on Form 10-K for 2007, filed on April 3, 2008, that "[a]s of this date neither ARC Finance Group nor [Heart Tronics] knows if the independent trustees have sold any of such shares or, in the alternative, increased their position.  ARC Finance Group... to our knowledge [] has not, to date, sold those shares."  Stein reviewed the Company's Commission filings during 2006 and 2007 and knew that the filings were materially false and misleading.  Stein knew or was reckless in not knowing that, contrary to the disclosures in Heart Tronics' periodic filings, shares of Heart Tronics stock under the control of ARC Finance were being continuously sold into the market through the ARC Blind Trust and THS Blind Trust and that Nevdahl was wiring the proceeds of the sales to the Steins' bank accounts.

94.     Between approximately March 2008 and May 2008, ARC Finance also transferred more than 10 million shares of Heart Tronics stock to three additional trusts: relief defendants JAYMI Blind Trust, Oak Tree Investments Blind Trust, and the WBT Investments Blind Trust.  Nevdahl was the broker and trustee for the JAYMI Blind Trust, Oak Tree Investments Blind Trust and WBT Investments Blind Trust as well.  On April 14, 2008, the same day as the webcast in which Harmison announced revenue projections of $40 million, Nevdahl sold 25,000 shares of Heart Tronics stock on behalf of the JAYMI Blind Trust.

**B. Schemes to Sell Improperly Registered S-8 Stock**

95.     In addition to profiting from the sale of Heart Tronics shares held by ARC Finance through the scheme described above using the trusts, Stein devised a scheme to profit from stock Heart Tronics issued to Carter from transactions registered with the Commission on Form S-8.

//

96.   Starting in 2006, Heart Tronics had registered millions of shares of Heart Tronics stock on Form S-8 registration statements filed with the Commission on June 12, 2006, October 11, 2006, November 20, 2006, May 19, 2008, and November 5, 2008.  These shares were purportedly to be issued pursuant to the Company's Omnibus Equity Compensation Plan.

97.   Form S-8 is available to register the offer and sale of a company's stock to employees or consultants under certain circumstances.  The eligible employees or consultants must perform permissible, *bona fide* services that are not in connection with a capital raising transaction and do not indirectly promote or maintain a market for the stock.

98.   Form S-8 is not available to register offers and sales of securities to consultants where, by prearrangement or otherwise, the issuer or a promoter controls or directs the resale of the securities in the public market, or the issuer or its affiliates directly or indirectly receive a percentage of the proceeds from such resales.  In addition, consultants who provide investor relations or shareholder communications services may not receive S-8 stock because of the promotional nature of their services.

99.   An improper use of S-8 shares – *i.e.*, under the prohibited circumstances described below – is not an effective registration of the S-8 shares, or their subsequent sale, under Section 5 of the Securities Act.

100.   In approximately January 2008, Stein drafted and caused Heart Tronics to enter into a consulting agreement by which Heart Tronics hired Carter to consult on product engineering and design with the intention that Carter would be compensated primarily with S-8 stock.  In fact, Carter lacked the education, skills and resources to provide the services described in the contract, and he provided no services to Heart Tronics under the contract.

101.   Notwithstanding the fact that Carter provided no meaningful services to Heart Tronics, between approximately November 2007 and September 2008,

1   Heart Tronics paid Carter approximately $2 million under the consulting contract
2   in the form of cash (approximately $600,000) and 6.035 million shares of Heart
3   Tronics stock from transactions registered on Form S-8 (valued at approximately
4   $1.47 million based on the stock price on the date of each issuance).  Stein caused
5   the Company to instruct its transfer agent to issue the shares to Carter.

6       102.   Between approximately January 2008 and September 2008, Carter
7   sold substantially all the S-8 stock issued to him under his purported consulting
8   contract in personal brokerage accounts or in accounts accessible to both him and
9   Stein, including accounts in the name of relief defendant Five Investments
10  Partnership.  Carter then transferred substantially all of the stock, or the proceeds
11  from the sales of the stock, to bank or brokerage accounts controlled by Stein.
12  Accordingly, both because of these transfers and because Carter performed no
13  *bona fide* services to Heart Tronics, the issuance of S-8 stock to Carter was a
14  violation of the registration requirements of Section 5 of the Securities Act.

15      103.   On approximately February 6, 2008, Heart Tronics also issued
16  approximately 500,000 shares of common stock from transactions registered on
17  Form S-8 as compensation to at least three other individuals who were hired by
18  Stein to promote Heart Tronics stock on the Internet.  Stein signed the contracts
19  with the promoters, created false documents that identified the promoters as
20  "subcontractors" working on engineering matters under Carter's consulting
21  contract, and caused Heart Tronics to issue the shares to the promoters.  Because
22  these individuals were not providing permissible consulting services in exchange
23  for the issuance of S-8 stock, these issuances were also in violation of Section 5 of
24  the Securities Act.

25  **III.   Stein and Gault Defrauded an Individual Investor**

26      104.   In addition to the above schemes, as described in more detail below,
27  beginning in late 2008, in connection with the purchase and sale of securities, Stein
28  and the Company's then co-CEO, defendant Willie Gault, defrauded an individual

1   investor in Heart Tronics out of more than $150,000 for their personal gain.

2       105.  More specifically, between approximately November and December

3   2008, an individual investor (the "Investor") made private investments of more

4   than $150,000 in Heart Tronics in exchange for a series of convertible interest-

5   bearing note securities from the Company.  In making his investment decision, the

6   Investor relied on false statements by Stein and Gault that Heart Tronics was close

7   to generating revenue through product sales to customers in Mexico, South

8   America and Canada. ·Stein also told the Investor that Heart Tronics, which was

9   nearly bankrupt at the time, needed an infusion of capital to fund operations while

10  marketing the product and pursuing imminent sales leads.

11      106.  On approximately November 4, 2008, the Investor wire transferred

12  $100,000 to a joint bank account he established with Gault in exchange for a note

13  security issued by the Company.  Stein and Gault had represented that the funds

14  deposited would be used to pay the Company's operating expenses while it tried to

15  generate sales revenue to repay the note.  This investment was disclosed by Heart

16  Tronics in its Form 10-Q for the period ended September 30, 2008, filed with the

17  Commission on November 19, 2008, at Gault's authorization during his tenure as

18  co-CEO.

19      107.  In approximately December 2008, in exchange for another note, the

20  Investor again deposited $50,000 in the joint bank account with Gault, based on

21  Stein and Gault's representations that the funds would be used to pay Heart

22  Tronics' operating expenses.

23      108.  However, even though they had told the Investor that Heart Tronics

24  would use the invested capital for corporate expenses, Stein and Gault fraudulently

25  diverted the invested capital for their own personal use.

26      109.  For example, on the same day as the Investor's initial transfer to the

27  joint bank account, $20,000 was transferred to a brokerage account owned by

28  Gault in the name of relief defendant Catch 83 General Partnership.

110.   Over the next approximately two months, Gault, with Stein's knowledge and participation, transferred all or substantially all of the joint bank account's balance, without the Investor's knowledge or authorization, to his Catch 83 General Partnership brokerage account.  Gault, with Stein's knowledge and participation, used the money to trade Heart Tronics' stock in his personal brokerage account.

111.   None of the capital invested by the Investor was used to pay Company expenses, despite Stein and Gault's representations.  The Investor suffered a complete loss of his investment.

112.   Despite numerous requests from the Company's CFO, Gault refused to provide the CFO access to the joint bank account or provide an accounting of the assets in the account or a description of the use of the cash.

**IV.   False Statements in Commission Filings, Sarbanes-Oxley Certifications, and the Company's Accounting Books and Records**

113.   As described above, from late 2006 through 2008, Heart Tronics issued numerous false and misleading press releases and filed numerous false and misleading reports with the Commission, referencing the fictitious sales orders of the Fidelity 100.

114.   In addition to the false and misleading public filings and announcements, Heart Tronics' books and records reflected various purchase orders, invoices, and other documents relating to fictitious sales orders described above that had purportedly been placed by customers that did not exist.

115.   That is because, in part, Heart Tronics did not have reasonable accounting controls to ensure that the purported product sales in 2006 through 2008 were to *bona fide* customers.  The Company had no written accounting policies or procedures, and the Company's most senior officers, including Gault and Perkins, exercised no independent judgment but relied solely on Stein.

//

116.   Through Stein's control of Heart Tronics and acts of deception, Stein and Carter were able to circumvent the entire system of accounting controls, to the extent any existed, and substantially further the Company's recording and disclosure of fraudulent sales orders.  Even as the Company's officers and directors became skeptical of the pending purchase orders, Perkins knowingly failed to implement a reasonable system of internal accounting controls.  Likewise, Gault knowingly circumvented the Company's internal controls to effect the fraud he committed against the Investor with Stein.

117.   While most of the false press releases and reports described above were issued during Harmison's tenure as CEO, the false and misleading Commission filings continued under the leadership of Gault and Perkins after Harmison resigned in late April 2008.

118.   As Heart Tronics' CEO or co-CEO from late April 2008 to the present, Perkins reviewed and signed at least three of the Company's quarterly reports filed with the Commission, which he knew or was reckless in not knowing contained materially false and misleading information concerning, among other things, its sales orders and potential customers.

119.   Perkins also signed materially false and misleading certifications required by the Sarbanes-Oxley Act of 2002 ("SOX").  In SOX certifications filed with the Company's Form 10-Qs for the periods ended March 31, 2008, July 31, 2008, and September 30, 2008 (filed with the Commission on May 15, 2008, August 15, 2008, and November 19, 2008, respectively), Perkins falsely represented that based on his knowledge, each filing did not "contain any untrue statement of a material fact or [omission]."  Perkins did not have a basis for these representations because the filings included disclosures of the Company's pending sales orders, and Perkins was aware of numerous red flags concerning those disclosures – including specific information about potential fraud associated with the IT Healthcare shipments to a residential address in Ohio.

120.    Further, as part of each of these filings, Perkins certified that he designed and evaluated the effectiveness of Heart Tronics' disclosure controls and procedures and internal controls over financial reporting. This certification was materially false and misleading because the Company had no reasonable system of internal controls, and Perkins undertook no effort to design, supervise or evaluate the purported controls. Perkins also falsely certified that he had disclosed to Heart Tronics' auditor and Audit Committee of the Board of Directors "any fraud, whether material or not, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting," but he failed to do so, even after the President informed him of suspected fraud in the IT Healthcare transaction and Perkins took no action.

121.    Gault was designated Heart Tronics' "co-CEO for Operations" in October 2008, but he was little more than a celebrity figurehead who provided no meaningful oversight to the Company.

122.    On or about November 19, 2008, Gault authorized the filing of both a Form 10-Q for the third fiscal quarter of 2008 and a SOX certification filed with the Commission on November 19, 2008, in his capacity as one of Heart Tronics' principal executive officers. In fact, Gault never manually signed any version of either document, in violation of the federal securities laws. These documents were electronically filed with the Commission at Gault's direction under Gault's signature.

123.    Gault's practice was to not review or read the periodic reports that Heart Tronics filed with the Commission, even though he was the Company's co-CEO for Operations and the reports were filed at his authorization under his signature.

124.    Thus, Gault's SOX certifications were materially false and misleading. For example, contrary to his SOX certifications, Gault never actually "reviewed this quarterly report on form 10-Q," and had no basis to state "based on

1  [his] knowledge, this report does not contain any untrue statement of a material

2  fact or [omission]" or that "based on [his] knowledge, the financial

3  statements...fairly present in all material respects the financial condition" of Heart

4  Tronics. Similarly, Gault had no basis for certifying the he was responsible for

5  establishing and maintaining disclosure controls and procedures and internal

6  control over financial reporting. Finally, Gault falsely represented that he had

7  disclosed to the Company's auditor and Audit Committee "[a]ny fraud, whether or

8  not material, that involves management or other employees who have a significant

9  role in [Heart Tronics'] internal controls over financial reporting," when he did not

10  do so, even though Gault himself defrauded an individual investor into investing

11  money in Heart Tronics during this period.

12  **FIRST CLAIM FOR RELIEF**

13  **Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**

14  (Heart Tronics, Stein, Carter, Perkins, Gault, and Nevdahl)

15  125.   Paragraphs 1 through 124 are realleged and incorporated herein by

16  reference.

17  *Employing Devices, Schemes, and Artifices to Defraud, and Engaging in Acts,*

18  *Practices and Courses of Business Operating As a Fraud of Deceit in Violation of*

19  *Section 10(b) and Rule 10b-5(a) and (c)*

20  126.   By reason of the conduct described above, defendants Heart Tronics,

21  Stein, Carter, Gault, and Nevdahl, in connection with the purchase or sale of

22  securities, by the use of the means or instrumentalities of interstate commerce or of

23  the mails, or of any facility of any national securities exchange, directly or

24  indirectly, knowingly or recklessly (1) employed devices, schemes, or artifices to

25  defraud or (2) engaged in acts, practices, or course of business which operates or

26  would operate as a fraud or deceit upon any persons, including purchasers or

27  sellers of the securities, in violation of Exchange Act Section 10(b) [15 U.S.C. §

28  78j(b)] and subsections (a) and (c) of Exchange Act Rule 10b-5 [17 C.F.R. §

240.10b-5(a) and (c)].   Unless enjoined, these defendants will continue to violate Exchange Act Section 10(b) and subsections (a) and (c) of Exchange Act Rule 10b-5.

*Making Misrepresentations and Misleading Omissions of Material Fact in Violation of Section 10(b) and Rule 10b-5(b)*

127.   By further reason of the conduct described above, defendants Heart Tronics, Stein, Gault, and Perkins in connection with the purchase or sale of securities, directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, knowingly or recklessly, made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and subsection (b) of Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5(b)].

128.   More specifically, these defendants violated and, unless enjoined, will continue to violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and subsection (b) of Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5(b) by the following:

(a)   Heart Tronics, through the actions of its officers, directors, employees, attorneys, agents and controlling person, including but not necessarily limited to the issuance of materially false and misleading press releases, Commission filings, and other public broadcasts described above.

(b)   Stein's actions including but not necessarily limited to making false and misleading statements about Heart Tronics to an Investor in late 2008.

(c)   Gault's actions including, but not necessarily limited to (1) making false and misleading statements about Heart Tronics to

an Investor in late 2008; and (2) authorizing the issuance a false
and misleading periodic report filed with the Commission on
Form 10-Q for Heart Tronics' fiscal quarter ended September
30, 2008, including the SOX certifications included therewith,
under his signature.

(d)     Perkins actions including, but not necessarily limited to, signing
false and misleading periodic reports filed with the Commission
on Forms 10-Q for Heart Tronics' fiscal quarters ended March
31, 2008, June 30, 2008, and September 30, 2008, including the
SOX certifications included therewith.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

(Heart Tronics, Stein, Gault, Carter, and Nevdahl)

129.   Paragraphs 1 through 124 are realleged and are incorporated herein by
reference.

130.   Defendants Heart Tronics, Stein, Gault, Carter, and Nevdahl have,
directly or indirectly, by use of means of instrumentalities of transportation or
communication in interstate commerce or by use of the mails, in the offer or sale of
securities: (a) knowingly or recklessly employed devices, scheme or artifices to
defraud; (b) knowingly, recklessly, or negligently obtained money or property by
means of any untrue statements of material fact, or have omitted to state material
facts necessary in order to make the statements made, in light of the circumstances
under which they were made, not misleading; and (c) knowingly, recklessly or
negligently engaged in transactions, practices, or courses of business which
operated or would operate as a fraud or deceit upon the purchasers of securities; in
violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

131.   More specifically, defendants Heart Tronics, Stein, Gault, Carter, and
Nevdahl violated and, unless enjoined, will continue to violate, Sections 17(a)(1)

1  and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)] by employing the

2  fraudulent schemes and other activities described above.

3      132.  Furthermore, defendants Heart Tronics, Stein, and Gault violated and,

4  unless enjoined, will continue to violate, Section 17(a)(2) of the Securities Act [15

5  U.S.C. § 77q(a)] by obtaining money and property by means of the various

6  materially false and misleading press releases, Commission filings, and other

7  public broadcasts described above, as well as the false and materially misleading

8  statements in late 2008 to an Investor.

9                      **THIRD CLAIM FOR RELIEF**

10    **Aiding and Abetting Violations of Section 10(b) of the Exchange Act**

11                      **and Rule 10b-5 Thereunder**

12                  (Stein, Carter, Gault, and Nevdahl)

13     133.  Paragraphs 1 through 124 and paragraphs 126 through 128 above are

14  realleged and incorporated by reference.

15                  *Primary Violations by Heart Tronics and Stein*

16     134.  By reason of the conduct described above, and particularly as set forth

17  in the First Claim for Relief above, Heart Tronics and Stein violated Section 10(b)

18  of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

19  240.10b-5].

20  *Defendants Knowingly Provided Substantial Assistance to the Primary Violations*

21     135.  Defendant Stein, acting knowingly, provided substantial assistance to

22  Heart Tronics' violations of Section 10(b) of the Exchange Act [15 U.S.C. §

23  78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by his actions

24  described above.

25     136.  Defendant Carter, acting knowingly, provided substantial assistance to

26  Heart Tronics' and Stein's violations of Section 10(b) of the Exchange Act [15

27  U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by his actions

28  described above.

137.  Defendant Gault, acting knowingly, provided substantial assistance to Heart Tronics' and Stein's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by his actions described above.

138.  Defendant Nevdahl, acting knowingly, provided substantial assistance to Stein's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by his actions described above.

139.  Accordingly, Stein, Carter, Gault, and Nevdahl aided and abetted the primary violations described above and, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Stein, Carter, Gault, and Nevdahl are liable for such violations.

140.  Unless restrained and enjoined, Stein, Carter, Gault and Nevdahl will continue to aid and abet, or will in the future aid and abet, violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## FOURTH CLAIM FOR RELIEF

### Controlling Person Liability for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

(Stein)

141.  Paragraphs 1 through 124 and paragraphs 126 through 128 above are realleged and incorporated by reference.

142.  Stein (a) directly or indirectly controlled Heart Tronics; (b) possessed the power and ability to control Heart Tronics as to its violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5; (c) was in a meaningful sense a culpable participant in Heart Tronics' violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5, including by knowingly authorizing and causing Heart Tronics to issue false and misleading statements in press releases, Commission filings and other public broadcasts.

//

1    143.   Stein is jointly and severally liable with and to the same extent as

2    Heart Tronics for Heart Tronics' violations of Exchange Act Section 10(b) and

3    Exchange Act Rule 10b-5, as stated above in the First Claim for Relief.

4    144.   By engaging in the conduct described above, Stein is liable as a

5    controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §

6    78t(a)] by controlling, and possessing the power and ability to control, Heart

7    Tronics in its violation of Exchange Act Section 10(b) and Rule 10b-5.

8    145.   Unless enjoined, Stein will again engage in conduct that would render

9    him liable, under Section 20(a) of the Exchange Act, for violations of Section

10    10(b) of the Exchange Act and Rule 10b-5 thereunder.

11    ### FIFTH CLAIM FOR RELIEF

12    #### Violations Section 5(a) and 5(c) of the Securities Act

13    (Heart Tronics, Stein and Carter)

14    146.   Paragraphs 1 through 124 are realleged and incorporated herein by

15    reference.

16    147.   Defendants Heart Tronics, Stein and Carter directly or indirectly,

17    singly or in concert with others: (1) without a registration statement in effect as to

18    the securities transaction, (a) made use of the means or instrumentalities of

19    transportation or communication or the mails in interstate commerce to sell

20    securities through the use or medium of a prospectus or otherwise, or (b) carried or

21    caused to be carried such securities for the purpose of sale or for delivery after

22    sale; and (2) made use of the means or instrumentalities of transportation or

23    communication or the mails in interstate commerce to sell or offer to buy through

24    the use or medium of a prospectus or otherwise securities as to which a registration

25    statement had not been filed as to such securities.

26    148.   By engaging in the conduct described above regarding the unlawful

27    issuance and sale of shares of Heart Tronics stock from transactions registered on

28    Form S-8 pursuant to sham consulting agreements, defendants Heart Tronics, Stein

1 | and Carter violated and, unless enjoined will continue to violate, Sections 5(a) and
2 | (c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

### SIXTH CLAIM FOR RELIEF

**Violations of Section 13(a), 13(b)(2)(A), 13(b)(2)(B) of the Exchange Act and
Exchange Act Rules 12b-11, 12b-20, 13a-1, 13a-11, and 13a-13**

(Heart Tronics)

149.   Paragraphs 1 through 124 are realleged and incorporated herein by reference.

150.   Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] require issuers of securities registered pursuant to Section 12 of the Exchange Act to file with the Commission accurate periodic reports. Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20] requires that periodic reports contain any additional material information necessary to make the required statements made in the reports not materially misleading.  Exchange Act Rule 12b-11 [17 C.F.R. § 240.12b-11] requires any document required to be filed with or furnished to the Commission "shall be manually signed," or the "signatory to the filing shall manually sign a signature page or other document authenticating, acknowledging or otherwise adopting his or her signature that appears in the filing."

151.   As set forth above, defendant Heart Tronics filed reports with the Commission that contained materially false and misleading statements and information, and failed to include additional material necessary to make the statements and information, in light of the circumstances in which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13.

152.   In addition, as set forth above, from at least December 2005 through December 2008, defendant Heart Tronics failed to (a) maintain and keep books,

1  records, and accounts, which, in reasonable detail, accurately and fairly reflected

2  the transactions and dispositions of its assets, and (b) devise and maintain a system

3  of internal accounting controls sufficient to provide reasonable assurances that: (i)

4  transactions were executed in accordance with management's general or specific

5  authorization; (ii) transactions were recorded as necessary to permit preparation of

6  financial statements in conformity with generally accepted accounting principles or

7  any other criteria applicable to such statements, and to maintain accountability for

8  assets; (iii) access to assets was permitted only in accordance with management's

9  general or specific authorization; and (iv) the recorded accountability for assets

10 was compared with the existing assets at reasonable intervals and appropriate

11 action was taken with respect to any differences.  As a result, Heart Tronics

12 violated Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§

13 78m(b)(2)(A) and 78m(b)(2)(B)].

14      153.   Furthermore, set forth above, Heart Tronics failed to obtain and retain

15 manual signatures on its documents filed with or furnished to the Commission, or

16 obtain and retain a signature page or other document authenticating,

17 acknowledging or otherwise adopting each signatory's signature that appears in the

18 filing.  Heart Tronics failed to furnish to the Commission staff, upon its request, a

19 copy of any or all documents retained pursuant to Exchange Act Rule 12b-11.  As

20 a result, it violated Exchange Act Rule 12b-11.

21      154.   By reason of the foregoing, Heart Tronics violated and, unless

22 enjoined, will continue to violate Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of

23 the Exchange Act, and Exchange Act Rules 12b-11, 12b-20, 13a-1, 13a-11, and

24 13a-13.

25 //

26 //

27 //

28 //

## SEVENTH CLAIM FOR RELIEF

**Aiding and Abetting Heart Tronics' Violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Exchange Act Rules 13a-1, 13a-11, 13a-13, and 12b-20**

(Stein, Perkins, and Carter)

155.   Paragraphs 1 through 124 and paragraphs 150 through 154 are realleged and incorporated herein by reference.

156.   As set forth in the Sixth Claim for Relief above, defendant Heart Tronics violated Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Exchange Act Rules 13a-1, 13a-11, 13a-13, and 12b-20 [17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13, and 240.12b-20].

157.   Based on the facts set forth above, defendants Stein, Perkins and Carter knowingly provided substantial assistance to defendant Heart Tronics in the commission of certain of these violations.  More specifically:

a)     Stein, acting knowingly, substantially assisted Heart Tronics' violations of  Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Exchange Act Rules 13a-1, 13a-11, 13a-13, and 12b-20.  Accordingly, Stein is liable for such violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Unless restrained and enjoined, Stein will continue to aid and abet, or will in the future aid and abet, these violations.

b)     Carter, acting knowingly, substantially assisted Heart Tronics' violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 13a-1, 13a-11, 13a-13, and 12b-20.  Accordingly, Carter is liable for such violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Unless restrained and enjoined, Carter will continue to aid and abet, or will in the future aid and abet, these violations.

c)     Perkins, acting knowingly, substantially assisted Heart Tronics'

1  violations of Section 13(b)(2)(B) of the Exchange Act.  Accordingly, Perkins is

2  liable for such violation pursuant to Section 20(e) of the Exchange Act [15 U.S.C.

3  § 78t(e)].  Unless restrained and enjoined, Perkins will continue to aid and abet, or

4  will in the future aid and abet, this violation.

### EIGHTH CLAIM FOR RELIEF

#### Violations of Exchange Act Rule 13b2-1

(Stein and Carter)

8      158.   Paragraphs 1 through 124 are realleged and incorporated herein by

9  reference.

10     159.   Defendants Stein and Carter directly or indirectly falsified or caused

11  to be falsified books, records or accounts of Heart Tronics that were subject to

12  Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

13     160.   By engaging in the conduct described above, defendants Stein and

14  Carter violated and, unless enjoined, will continue to violate Exchange Act Rule

15  13b2-1 [17 C.F.R. § 240.13b2-1].

### NINTH CLAIM FOR RELIEF

#### Violations of Section 13(b)(5) of the Exchange Act

(Stein, Gault, Perkins, and Carter)

19     161.   Paragraphs 1 through 124 are realleged and incorporated herein by

20  reference.

21     162.   Defendants Stein, Gault, Perkins and Carter knowingly circumvented

22  or knowingly failed to implement a system of internal accounting controls or

23  knowingly falsified, directly or indirectly, or caused to be falsified books, records

24  or accounts of Heart Tronics maintained pursuant to Section 13(b)(2) of the

25  Exchange Act.

26     163.   By engaging in the conduct described above, defendants Stein, Gault,

27  Perkins and Carter violated and, unless enjoined, will continue to violate Section

28  13(b)(5) [15 U.S.C. § 78m(b)(5)] of the Exchange Act.

# TENTH CLAIM FOR RELIEF

## Violations of Exchange Act Rule 13a-14

### (Gault and Perkins)

164.    Paragraphs 1 through 124 are realleged and incorporated herein by reference.

165.    Gault violated Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] by providing a certification required by that rule to be signed on his behalf, pursuant to a power of attorney or other form of confirming authority, and by failing to manually sign the required certification included in Heart Tronics' quarterly report on Form 10-Q for the third fiscal quarter of 2008 filed with the Commission on November 19, 2008.

166.    In addition, Gault violated Rule 13a-14 by falsely certifying, among other things, (1) that the forms fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading; and (2) that he and other officer(s) of Heart Tronics had designed disclosure controls and procedures and internal controls over financial reporting, had evaluated such controls and procedures, and had identified no deficiencies when, in fact, Gault had done no such thing.

167.    Perkins violated Rule 13a-14 by signing Heart Tronics' quarterly reports on Form 10-Q for the first, second, and third fiscal quarters of 2008 (filed with the Commission on May 15, 2008, August 15, 2008, and November 19, 2008, respectively) certifying, among other things, (1) that the forms fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading; and (2) that he and other

1  officer(s) of Heart Tronics had designed disclosure controls and procedures and
2  internal controls over financial reporting, had evaluated such controls and
3  procedures, and had identified no deficiencies when, in fact, Perkins had done no
4  such thing.

5       168.  By engaging in the conduct described above, defendants Gault and
6  Perkins violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].  Unless
7  enjoined, defendants Gault and Perkins will continue to violate Rule 13a-14 [17
8  C.F.R. § 240.13a-14].

9          **ELEVENTH  CLAIM FOR RELIEF**
10          **Violation of Section 302(b) of Regulation S-T**
11          (Heart Tronics)

12       169.  Paragraphs 1 through 124 are realleged and incorporated herein by
13  reference.

14       170.  Defendant Heart Tronics violated Section 302(b) of Regulation S-T
15  by failing to ensure that all signatories of the certifications for its quarterly report
16  on Form 10-Q for the third fiscal quarter of 2008 (filed with the Commission on
17  November 19, 2008) had signed the certifications before or at the time they were
18  electronically filed, and by failing to retain the original executed documents for
19  five years, or to provide the Commission staff with copies of the documents upon
20  request.

21       171.  Unless restrained and enjoined, Heart Tronics will continue to violate
22  Section 302(b) of Regulation S-T [17 C.F.R. § 232.302(b)].

23          **TWELFTH CLAIM FOR RELIEF**
24          **Violations of Exchange Acts Section 13(d) and 16(a)**
25          **and Rules 13d-1 and 16a-3  thereunder**
26          (Stein)

27       172.  Paragraphs 1 through 124 are realleged and incorporated herein by
28  reference.

173.   By means of his indirect control over the blind trusts that he created to sell Heart Tronics stock held beneficially by his wife, Stein was the beneficial owner of more than 10% of Heart Tronics stock.  Pursuant to Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1 thereunder [17 C.F.R. § 240.13d-1] Stein was required to disclose his status as a beneficial owner of more than 5% of Heart Tronics' equity by filing the required forms with the Commission within 10 days of his becoming such a beneficial owner.  Stein never did so.  As a result, Stein violated and, unless enjoined, will continue to violate Section 13(d) of the Exchange Act and Rule 13d-1 thereunder.

174.   Moreover, not only did Stein beneficially own more than 10% of Heart Tronics' common stock, as set forth above, Stein was a *de facto* officer of Heart Tronics, in that he performed policy-making functions for Heart Tronics akin to an officer.  Accordingly, pursuant to Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3] thereunder, Stein was required to file with the Commission an initial statement on Form 3 disclosing his beneficial ownership position, as well as subsequent statements of changes on Forms 4 and 5.  Stein never did so.  As a result, Stein violated and, unless enjoined, will continue to violate Section 16(a) of the Exchange Act and Rule 16a-3 thereunder.

### THIRTEENTH CLAIM FOR RELIEF

### Violation of Securities Act Section 17(b)

(Rauch)

175.   Paragraphs 1 through 124 are realleged and incorporated herein by reference.

176.   As described in paragraphs 74 through 78 above, defendant Rauch, by use of means or instrumentalities of interstate commerce or of the mails, gave publicity to a security for consideration received, directly or indirectly, from an issuer, without fully disclosing the receipt of such consideration and the amount

1 | thereof.

2     177.   By reason of the activities described herein, Rauch violated and,

3 unless enjoined, will continue to violate Section 17(b) of the Securities Act [15

4 U.S.C. § 77q(b)].

## FOURTEENTH CLAIM FOR RELIEF

**Unjust Enrichment of Tracey Hampton-Stein; ARC Finance Group, LLC;**

**ARC Blind Trust; THS Blind Trust; JAYMI Blind Trust; Oak Tree**

**Investments Blind Trust; and WBT Investments Blind Trust**

9     178.   Paragraphs 1 through 124 are realleged and incorporated herein by

10 reference.

11     179.   As set forth above, defendant Stein profited from his illicit schemes

12 by, among other things, inflating and secretly selling stock in Heart Tronics that

13 had initially been held beneficially by his wife, relief defendant Tracey Hampton-

14 Stein, through relief defendant ARC Finance Group, LLC.  In an effort to avoid

15 reporting obligations and further deceive the marketplace about whether or not

16 Heart Tronics' majority shareholder was selling Heart Tronics stock, Stein effected

17 these sales, with the assistance of Hampton-Stein, through the purportedly blind

18 trusts, relief defendants ARC Blind Trust, THS Blind Trust, JAYMI Blind Trust,

19 Oak Tree Investments Blind Trust, and WBT Investments Blind Trust.

20     180.   As further set forth above, from at least December 2005 through

21 September 2008, while the share price of Heart Tronics' common stock was

22 artificially inflated as a result of Stein's illicit activities, Hampton-Stein, ARC

23 Finance, ARC Blind Trust, THS Blind Trust, JAYMI Blind Trust, Oak Tree

24 Investments Blind Trust, and WBT Investments Blind Trust sold more than $5.8

25 million worth of Heart Tronics stock.

26     181.   Relief defendants Tracey Hampton-Stein, ARC Finance Group, LLC,

27 ARC Blind Trust, THS Blind Trust, JAYMI Blind Trust, Oak Tree Investments

28 Blind Trust, and WBT Investments Blind Trust therefore have no legitimate claim

1  to those funds, and have thus been unjustly enriched under circumstances in which

2  it is not just, equitable, or consciable for them to retain such profits.

### FIFTEENTH CLAIM FOR RELIEF

#### Unjust Enrichment of Catch 83 General Partnership

5      182.   Paragraphs 1 through 124 are realleged and incorporated herein by

6  reference.

7      183.   Defendant Gault transferred the ill-gotten gains from his fraud on the

8  Investor to relief defendant Catch 83 General Partnership and used the ill-gotten

9  gains to purchase and sell shares of Heart Tronics stock.  Catch 83 General

10  Partnership therefore has no legitimate claim to those funds, and has thus been

11  unjustly enriched under circumstances in which it is not just, equitable, or

12  consciable for it to retain such profits.

### SIXTEENTH CLAIM FOR RELIEF

#### Unjust Enrichment of Five Investments Partnership

15      184.   Paragraphs 1 through 124 are realleged and incorporated herein by

16  reference.

17      185.   As described above, defendants Stein and Carter engaged in an illicit

18  scheme to have Heart Tronics issue stock from transactions registered on Form S-8

19  to Carter pursuant to a sham consulting contract.  They then proceeded to transfer

20  such stock, or to sell that stock and deliver proceeds from such sales, to relief

21  defendant Five Investments Partnership, a partnership they had established for the

22  very purpose of furthering their schemes.  Five Investments Partnership therefore

23  has no legitimate claim to those funds, and has thus been unjustly enriched under

24  circumstances in which it is not just, equitable, or consciable for it to retain such

25  profits.

### PRAYER FOR RELIEF

27      WHEREFORE, the Commission respectfully requests that this Court enter a

28  final judgment:

A.  preliminarily and permanently enjoining defendant Heart Tronics
from violating Sections 5(a) and (c), and Section 17(a) of the
Securities Act; Securities Act Regulation S-T, Rule 302(b); Sections
10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and
Exchange Act Rules 10b-5, 12b-11, 12b-20, 13a-1, 13a-11, and 13a-
13.

B.  preliminarily and permanently enjoining defendant Stein from
violating Sections 5(a) and (c), and Section 17(a) of the Securities
Act; Sections 10(b), 13(b)(5), 13(d), and 16(a) of the Exchange Act;
and Exchange Act Rules 10b-5, 13b2-1, 13d-1, and 16a-3; and from
aiding and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A),
and 13(b)(2)(B) of the Exchange Act and Exchange Act Rules 10b-5,
12b-20, 13a-1, 13a-11, and 13a-13.

C.  preliminarily and permanently enjoining defendant Gault from
violating Section 17(a) of the Securities Act; Sections 10(b) and
13(b)(5) of the Exchange Act; and Exchange Act Rules 10b-5 and
13a-14; and from aiding and abetting violations of Sections 10(b) of
the Exchange Act and Exchange Act Rule 10b-5.

D.  preliminarily and permanently enjoining defendant Perkins from
violating Sections 10(b) and 13(b)(5) of the Exchange Act and
Exchange Act Rules 10b-5(b) and 13a-14; and from aiding and
abetting violations of Section 13(b)(2)(B) of the Exchange Act.

E.  preliminarily and permanently enjoining defendant Carter from
violating Sections 5(a) and (c), and Sections 17(a)(1) and (3) of the
Securities Act; Sections 10(b) and 13(b)(5) of the Exchange Act; and
Exchange Act Rules 10b-5(a) and (c), and 13b2-1; and from aiding
and abetting violations of Sections 10(b), 13(a), 13(b)(2)(A) of the
Exchange Act and Exchange Act Rules 10b-5, 12b-20, 13a-1, 13a-11,

1    and 13a-13.

2  F.   preliminarily and permanently enjoining defendant Nevdahl from

3       violating Sections 17(a)(1) and (3) of the Securities Act; Section 10(b)

4       of the Exchange Act; and Exchange Act Rules 10b-5(a) and (c); and

5       from aiding and abetting violations of Sections 10(b) of the Exchange

6       Act and Exchange Act Rule 10b-5.

7  G.   preliminarily and permanently enjoining defendant Rauch from

8       violating Section 17(b) of the Securities Act.

9  H.   ordering defendants Heart Tronics, Stein, Gault, Perkins, Carter,

10      Nevdahl, and Rauch to disgorge, jointly and severally, all ill-gotten

11      gains, plus prejudgment interest thereon, wrongfully obtained as a

12      result of their illegal conduct, and provide an accounting of monies

13      and shares of Heart Tronics stock that they received and the

14      disposition of such monies and stock;

15 I.   ordering defendants Heart Tronics, Stein, Gault, Perkins, Carter,

16      Nevdahl, and Rauch to pay civil penalties pursuant to Section 20(d) of

17      the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) [15 U.S.C.

18      § 78u(d)] of the Exchange Act; and

19 J.   permanently barring defendants Stein, Gault, Perkins and Carter,

20      pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and

21      Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], from

22      serving as an officer or director of any issuer that has a class of

23      securities registered pursuant to Section 12 of the Exchange Act [15

24      U.S.C. §78l] or that is required to file reports pursuant to Section 13

25      of the Exchange Act [15 U.S.C. §78m];

26 K.   prohibiting defendants Stein, Gault, Perkins, Carter and Rauch from

27      engaging in any offering of penny stock pursuant to Section 20(g) of

1   the Securities Act [15 U.S.C. §77t(g)] and Section 21(d)(6) of the

2   Exchange Act [15 U.S.C. § 78u(d)(6)];

3   L.   ordering relief defendants Tracey Hampton-Stein, ARC Finance

4        Group, LLC, ARC Blind Trust, THS Blind Trust, WBT Investments

5        Blind Trust, JAYMI Blind Trust, Five Investments Partnership, and

6        Catch 83 General Partnership to disgorge, jointly and severally, all

7        monies, plus prejudgment interest thereon, obtained as a result of the

8        defendants' illegal conduct alleged in this Complaint, and provide an

9        accounting of monies and shares of Heart Tronics stock that they

10       received and the disposition of such monies and stock;

11  M.   granting the Commission such other relief as is just and appropriate.

12

13  Dated: December 20, 2011          Respectfully submitted,

14

15

16  David J. Van Havermaat, Cal. Bar No. 175761
    Local Counsel

17  vanhavermaatd@sec.gov
    Securities and Exchange Commission

18  5670 Wilshire Boulevard, 11th Floor
    Los Angeles, CA 90036

19  Telephone: (323) 965-3840
    Facsimile: (323) 965-3908

20

21  Mark D. Lanpher
    lanpherm@sec.gov

22  Securities and Exchange Commission
    100 F. Street, NE

23  Washington, DC 20549
    Tel: (202) 551-4879

24  Fax: (202) 551-9282

25  *Of Counsel*
    Stephen L. Cohen
    Charles E. Cain

26  Adam J. Eisner
    Rachel E. Nonaka

27  Securities and Exchange Commission
    100 F. Street, NE

28  Washington, DC 20549

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV11- 1962 JVS (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Mark Lanpher
100 F Street, N.E., Washington DC, 20549
David J. Van Havermaat
5670 Wilshire Blvd, 11th Floor
Los Angeles, CA, 90036

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| Securities and Exchange Commission, | CASE NUMBER |
|---|---|
| PLAINTIFF(S)<br><br>v.<br><br>Heart Tronics, Inc., Mitchell Jay Stein, Willie James Gault, J. Rowland Perkins, II, Martin Bert Carter, Mark Crosby Nevdahl, and Ryan Allan Rauch,<br><br>_SEE ATTACHED_    DEFENDANT(S). | SACV11-1962-JVS (ANx)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Mark Lanpher_____, whose address is _100 F Street, N.E., Washington DC, 20549_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Dated: ___DEC 20 2011_____

Clerk, U.S. District Court

By: _____
        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                    **SUMMONS**

**COPY**

1  MARK LANPHER
   E-mail: lanpherm@sec.gov
2  Securities Exchange Commission
   100 F Street, N.E.
3  Washington, DC 20549
   Telephone: (202) 551-4879
4  Facsimile: (202) 772-9282

5  Local Counsel
   David J. Van Havermaat, Cal. Bar No. 175761
6  vanhavermaatd@sec.gov
   Securities and Exchange Commission
7  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, CA 90036
8  Telephone: (323) 965-3840
   Facsimile: (323) 965-3908
9  Attorneys for Plaintiff

10

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13

14  SECURITIES AND EXCHANGE          Case No.
    COMMISSION,
15
               Plaintiff,
16
        vs.
17
    HEART TRONICS, INC., MITCHELL JAY    **COMPLAINT**
18  STEIN, WILLIE JAMES GAULT,
    J. ROWLAND PERKINS, II, MARTIN
19  BERT CARTER,  MARK CROSBY
    NEVDAHL, and RYAN ALLAN RAUCH,
20            Defendants,

21  TRACEY HAMPTON-STEIN, ARC
    FINANCE GROUP, LLC, ARC BLIND
22  TRUST, THS BLIND TRUST, JAYMI
    BLIND TRUST, OAK TREE
23  INVESTMENTS BLIND TRUST, WBT
    INVESTMENTS BLIND TRUST, CATCH
24  83 GENERAL PARTNERSHIP, and FIVE
    INVESTMENTS PARTNERSHIP,
25            Relief Defendants.

26

27

28        Plaintiff Securities and Exchange Commission (the "Commission") alleges:

Name & Address:
Mark Lanpher
100 F Street, N.E., Washington DC, 20549
David J. Van Havermaat
5670 Wilshire Blvd, 11th Floor
Los Angeles, CA, 90036

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Securities and Exchange Commission, | CASE NUMBER |
|---|---|
| PLAINTIFF(S)<br><br>v. | 3ACV11-1962-JVS (ANx) |
| Heart Tronics, Inc., Mitchell Jay Stein, Willie James Gault, J. Rowland Perkins, II, Martin Bert Carter, Mark Crosby Nevdahl, and Ryan Allan Rauch,<br><br>SEE ATTACHED        DEFENDANT(S). | **SUMMONS** |

TO:     DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Mark Lanpher _____, whose address is 100 F Street, N.E., Washington DC, 20549 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __DEC 2 0 2011__

By: _____ MARILYN **SEAL** _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**COPY**

1  MARK LANPHER
   E-mail: lanpherm@sec.gov
2  Securities Exchange Commission
   100 F Street, N.E.
3  Washington, DC 20549
   Telephone: (202) 551-4879
4  Facsimile: (202) 772-9282

5  Local Counsel
   David J. Van Havermaat, Cal. Bar No. 175761
6  vanhavermaatd@sec.gov
   Securities and Exchange Commission
7  5670 Wilshire Boulevard, 11th Floor
   Los Angeles, CA 90036
8  Telephone: (323) 965-3840
   Facsimile: (323) 965-3908
9  Attorneys for Plaintiff

10

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13

14  SECURITIES AND EXCHANGE          Case No.
    COMMISSION,
15
               Plaintiff,
16
         vs.
17
    HEART TRONICS, INC., MITCHELL JAY      COMPLAINT
18  STEIN, WILLIE JAMES GAULT,
    J. ROWLAND PERKINS, II, MARTIN
19  BERT CARTER,  MARK CROSBY
    NEVDAHL, and RYAN ALLAN RAUCH,
20           Defendants,

21  TRACEY HAMPTON-STEIN, ARC
    FINANCE GROUP, LLC, ARC BLIND
22  TRUST, THS BLIND TRUST, JAYMI
    BLIND TRUST, OAK TREE
23  INVESTMENTS BLIND TRUST, WBT
    INVESTMENTS BLIND TRUST, CATCH
24  83 GENERAL PARTNERSHIP, and FIVE
    INVESTMENTS PARTNERSHIP,
25           Relief Defendants.

26

27

28      Plaintiff Securities and Exchange Commission (the "Commission") alleges:

Name & Address:
Mark Lanpher
100 F Street, N.E., Washington DC, 20549
David J. Van Havermaat
5670 Wilshire Blvd, 11th Floor
Los Angeles, CA, 90036

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| Securities and Exchange Commission,<br><br><br>PLAINTIFF(S)<br><br>v.<br><br>Heart Tronics, Inc., Mitchell Jay Stein, Willie James Gault, J. Rowland Perkins, II, Martin Bert Carter, Mark Crosby Nevdahl, and Ryan Allan Rauch,<br><br>*SEE ATTACHED*   DEFENDANT(S). | CASE NUMBER<br><br><br><br><br><br>**SUMMONS** |
|---|---|

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Mark Lanpher_____, whose address is _100 F Street, N.E., Washington DC, 20549_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____   By: _____
                                          Deputy Clerk

                                          *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | Heart Tronics, Inc.; Mitchell Jay Stein; Willie James Gault; J. Rowland Perkins, II; Martin Bert Carter; Mark Crosby Nevdahl; and Ryan Allan Rauch |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Mark Lanpher, SEC, 100 F Street, N.E., Washington DC, 20549; Ph. (202) 551-4879. Dave J. Van Havermaat, SEC 5670 Wilshire Blvd, 11th Floor, Los Angeles, CA, 90036, (323) 965-3866 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☑ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III.)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☐ Yes  ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☑ No     ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. §§ 78j(b), 78e, 78t(e), 77q(a) and (b), securities fraud

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | REAL PROPERTY | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**   Case Number: *SACV11-1962*

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

VIII(a). **IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

VIII(b). **RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

Check all boxes that apply   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. VENUE:** (When completing the following information, use an additional sheet if necessary.)

a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | |

b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Heart Tronics, Inc., Mitchell Stein, Willie Gault, Rowland Perkins - Los Angeles County. Ryan Rauch - Orange County | Martin Carter - Florida Mark Nevdahl - Washington |

c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date December 20, 2011

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |